IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF INDIANA, )<br><br>Plaintiffs, )<br><br>v. )<br><br>CLEVELAND-CLIFFS BURNS HARBOR LLC and CLEVELAND-CLIFFS STEEL LLC, )<br><br>Defendants ) | Civil Action No. 22-26 |

**COMPLAINT**

The United States of America, by the authority of the Attorney General of the United States and through its undersigned attorneys, acting on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Indiana ("State" or "Indiana"), on behalf of the Indiana Department of Environmental Management ("IDEM"), (collectively, "Plaintiffs"), file this Complaint and allege as follows:

**NATURE OF ACTION**

1.      This civil action comprises claims brought by the United States and Indiana against two Defendants, Cleveland-Cliffs Steel LLC ("CC Steel") and Cleveland-Cliffs Burns Harbor LLC ("CCBH") (collectively "Defendants" or "Cleveland-Cliffs").  The claims relate to the Cleveland-Cliffs Burns Harbor facility ("Burns Harbor Facility" or "Facility") in Burns Harbor, Porter County, Indiana, owned and operated by Cleveland-Cliffs.  The Facility is used by Cleveland-Cliffs to manufacture and finish steel.

1

2.     For over five years, Defendants and their steelmaking operation have violated pollution laws aimed at protecting health and the environment.  Those violations include illegal discharges of cyanide, ammonia, and other pollutants, as well as violations of emergency reporting requirements in the event of spills.  In responding to these illegal discharges, the United States and Indiana have also incurred costs that are recoverable from Cleveland-Cliffs.

3.     The United States asserts claims pursuant to the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq*., as amended; the Emergency Planning and Community Right-to-Know Act of 1986 ("EPCRA"), 42 U.S.C. § 11001 *et seq.*; and the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601 *et seq.*  The United States seeks injunctive relief, civil penalties, and cost recovery against Cleveland-Cliffs under the CWA, EPCRA, CERCLA, and their implementing regulations.

4.     Indiana asserts claims in this action under Title 13 of the Indiana Code ("IND. CODE") and Title 327 of the Indiana Administrative Code ("IAC").  Indiana seeks injunctive relief, civil penalties, and cost recovery against Cleveland-Cliffs under Title 13 and Title 327, and the rules adopted thereunder.

## **JURISDICTION AND VENUE**

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355; CWA Section 309(b), 33 U.S.C. § 1319(b); EPCRA Section 325(b)(3) and (c)(4), 42 U.S.C. § 11045(b)(3) and (c)(4); and CERCLA Section 113(b), 42 U.S.C. § 9613(b).

6.      This Court has supplemental jurisdiction over the state law claims asserted by Indiana pursuant to 28 U.S.C. § 1367(a) because the State claims are related to the federal claims and form part of the same case or controversy.

7.      Venue lies in this District pursuant to 28 U.S.C. §§ 1331, 1345, 1391(b) and (c) and 1395(a); CWA Section 309(b), 33 U.S.C. §§ 1319(b); EPCRA Section 325(b)(3), 42 U.S.C. § 11045(b)(3); and CERCLA Sections 107 and 113(b), 42 U.S.C. §§ 9607 and 9613(b), because the violations at the Facility have occurred and are occurring in this judicial district, and the release occurred within this district.

## NOTICE

8.      As a signatory to this Complaint, Indiana has actual notice of the commencement of this action in accordance with Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## THE PARTIES

9.      Plaintiffs are the United States, on behalf of EPA, and the State of Indiana, on behalf of IDEM.

10.     The United States Department of Justice has authority to bring this action on behalf of the Administrator of the EPA, pursuant to 28 U.S.C. §§ 516 and 519.

11.     The Indiana Attorney General is authorized to appear and represent Indiana in this case pursuant to IND. CODE §§ 4-6-3-2(a), 13-30-4-1, and 13-14-2-6.

12.     Defendant CCBH is organized as a limited liability company under the laws of Delaware, with a principal place of business in Burns Harbor, Indiana.

13.     Defendant CC Steel is organized as a limited liability company under the laws of Delaware, with a principal place of business in Chicago, Illinois.  CC Steel is the parent

company of CCBH.  CC Steel and CCBH are collectively referred to as "Cleveland-Cliffs" in this Complaint.

14.    Since December 9, 2020, Defendants CCBH and CC Steel have owned and operated a steel manufacturing and finishing facility known as the Burns Harbor Facility located at 250 U.S. Route 12, in Burns Harbor, Porter County, Indiana.

15.    Prior to December 9, 2020, the Burns Harbor Facility was owned and operated by ArcelorMittal USA, LLC, and ArcelorMittal Burns Harbor, LLC ("AMBH").

16.    Cleveland-Cliffs completed its acquisition of ArcelorMittal USA, LLC, and all its subsidiaries, including AMBH, on December 9, 2020.  As part of the acquisition, Cleveland-Cliffs assumed all ArcelorMittal liabilities relevant to the claims in this action.

17.    Defendants CCBH and CC Steel are each "persons" within the meaning of CWA Section 502(5), 33 U.S.C. § 1362(5), EPCRA Section 329(7), 42 U.S.C. § 11049(7); CERCLA Sections 101(21), 103(a) and 107, 42 U.S.C. §§ 9601(21), 9603(a) and 9607.

18.    CC Steel is the corporate parent of CCBH and, based upon reasonable investigation and the opportunity to take further discovery, exercises financial and managerial control over the Facility and over CCBH and has participated in, controlled, and/or directed the activities underlying the violations alleged in this Complaint.

## STATUTORY BACKGROUND

### Provisions of the Clean Water Act and Indiana Law

19.    CWA Section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person except, *inter alia*, in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued by EPA or an authorized state pursuant to CWA

Section 402, 33 U.S.C. § 1342.  Pursuant to 327 IAC 5-2-2, Indiana prohibits the discharge of

pollutants to "waters of the state" except as authorized by a duly issued NPDES permit.

20.    CWA Section 502(12), 33 U.S.C. § 1362(12), defines "discharge of a pollutant"

to mean, among other things, "any addition of any pollutant to navigable waters from any point

source." See also 327 IAC 5-1.5-11 (similarly defining "discharge of a pollutant").

21.    CWA Section 502(6), 33 U.S.C. § 1362(6), defines "pollutant" as "spoil, solid

waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes,

biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand,

cellar dirt and industrial, municipal, and agricultural waste discharged into water." See also 327

IAC 5-1.5-41.

22.    CWA Section 502(7), 33 U.S.C. § 1362(7), defines "navigable waters" as "waters

of the United States, including territorial seas."  Indiana law defines "waters of the state" to

include "the accumulations of water, surface and underground, natural and artificial, public and

private, or a part of the accumulations of water that are wholly or partially within, flow through,

or border upon Indiana."  IND. CODE § 13-11-2-265.

23.    CWA Section 502(14), 33 U.S.C. § 1362(14), defines "point source" as "any

discernible, confined and discrete conveyance, including but not limited to any pipe, ditch,

channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal

feeding operation, or vessel or other floating craft, from which pollutants are or may be

discharged." See also 327 IAC 5-1.5-40.

24.    CWA Section 402(a), 33 U.S.C. § 1342(a), provides that EPA may issue NPDES

permits that authorize the discharge of any pollutant to navigable waters, upon the condition that

such discharge will meet certain specific requirements of the CWA or such other conditions as

EPA determines necessary to carry out the provisions of the CWA.  In addition, EPA may prescribe conditions pertaining to test procedures, data and information collection, reporting, and such other requirements as deemed appropriate by EPA.

25.    40 C.F.R. § 122.21(g) requires permit applicants to identify "each type of process, operation, or production area which contributes wastewater to the effluent for each outfall," along with average flows and a description of the treatment the wastewater receives.  An applicant must also provide "[a] line drawing of the water flow through the facility with a water balance, showing operations contributing wastewater to the effluent and treatment units."

26.    NPDES permits establish "effluent limitations," which are defined as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from the point sources into navigable waters."  33 U.S.C. § 1362(11).

27.    Effluent limitations can be numeric effluent limitations, which prohibit a facility from exceeding concentration or mass-based limits on pollutants in a discharge into receiving waterbodies.

28.    Pollutants are subject to different types of numeric effluent limitations, such as maximum, minimum, daily maximum, 7-day average, and monthly average.  A pollutant may be subject to multiple limits, such as a daily and a 7-day or monthly average limit.

29.    Effluent limitations can also be narrative standards, which prohibit a facility from causing unacceptable impacts onto and into receiving waterbodies.

30.    327 IAC 2-6.1-5(4) requires a facility to report "spills to surface waters that include . . . hazardous substances or extremely hazardous substances when the amount spilled exceeds one hundred (100) pounds or the reportable quantity, whichever is less."  Pursuant to

327 IAC 2-6.1-7(3), upon discovery of a reportable spill, a facility must communicate the spill to IDEM as soon as possible, but within two hours of discovery.

31.    CWA Section 402(b), 33 U.S.C. § 1342(b), provides that a state may establish and administer its own permit program, and, after EPA authorizes the state's program, it may also issue NPDES permits.

32.    On January 1, 1975, pursuant to CWA Section 402(b), 33 U.S.C. § 1342(b), EPA delegated the administration of the federal NPDES permit program to the State of Indiana for discharges into the navigable waters within its jurisdiction. IDEM administers the NPDES permitting program in Indiana pursuant to IND. CODE § 13-13-5-1(1) and, with EPA, maintains concurrent enforcement authority over NPDES permits in Indiana.

33.    Notwithstanding the delegation of NPDES permitting and enforcement authority to a state under CWA Section 402(b), 33 U.S.C. § 1342(b), EPA retains the authority to commence a civil action for appropriate relief, including a permanent or temporary injunction, when any person violates, among other things, CWA Section 301, 33 U.S.C. § 1311, or violates any of the terms or conditions of an NPDES permit. 33 U.S.C. § 1319(b). Additionally, Indiana may seek injunctive relief for a violation of Indiana's water pollution control laws pursuant to IND. CODE §§ 13-30-1-1; 13-30-4-1(b)(2).

34.    CWA Section 309(d), 33 U.S.C. § 1319(d), provides that any person who violates Section 301 of the CWA, 33 U.S.C. § 1311, or who violates any condition or limitation of an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, shall be subject to civil penalties not to exceed $25,000 per day for each violation.

35.    The Civil Penalties Inflation Act of 1990, 28 U.S.C. § 2461 *et seq*., as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701 *et seq*., and the Federal

Civil Penalties Inflation Adjustment Act Improvements Act of 2015, require EPA to periodically adjust its civil penalties for inflation.  On December 11, 2008, August 1, 2016, January 15, 2017, January 15, 2018, January 13, 2020, and January 12, 2022, EPA adopted and revised regulations entitled "Civil Monetary Penalty Inflation Adjustment Rule," 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under the CWA.  For each violation that occurs between January 13, 2009, and through November 2, 2015, inclusive, penalties of up to $37,500 per day may be assessed; and $59,973 per day for each violation occurring on or after November 2, 2015.  73 Fed. Reg. 75340 (Dec. 11, 2008); 81 Fed. Reg. 43091 (July 1, 2016); 85 Fed. Reg. 1753 (Jan. 13, 2020), as amended at 85 Fed. Reg. 83820 (Dec. 23, 2020); 87 Fed. Reg. 1676 (Jan. 12, 2022).

36.    The provisions of 327 IAC § 5-2-20 and IND. CODE §§ 13-30-4-1 and 13-14-2-6 authorize Indiana to commence a civil action "in any court with jurisdiction" for appropriate relief to address environmental violations, including violations of Title 327 of the IAC, Article 5. Such relief may include a civil penalty of up to $25,000 per day for each violation.

**Provisions of the Emergency Planning and Community Right-to-Know Act (EPCRA)**

37.    EPCRA was enacted on October 17, 1986, as Title III of the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 (1986) (codified at 42 U.S.C. §§ 11001-11050).

38.    The purpose of EPCRA is to provide communities with information on potential chemical hazards within their boundaries and to foster state and local emergency planning efforts to control any accidental releases.  Emergency Planning and Community Right to-Know Programs, Interim Final Rule, 51 Fed. Reg. 41,570 (1986).

39.    EPCRA mandates that state emergency response commissions ("SERC") and local emergency planning committees ("LEPC") be created.  42 U.S.C. § 11001(a) and (c). EPCRA establishes a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of a health-threatening release.  42 U.S.C. § 11001.

40.    Sections 304(a) and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b), require the owner and operator of a facility at which a hazardous chemical is produced, used, or stored, to immediately notify the SERC and LEPC of certain specified releases of a hazardous or extremely hazardous substance.  See also IND. CODE 13-25-2-6.

41.    Section 304(c) of EPCRA, 42 U.S.C. § 11004(c), requires the owner and operator of a facility at which a hazardous chemical is produced, used, or stored, to provide follow-up written emergency notice to the SERC and LEPC of certain specified releases of a hazardous or extremely hazardous substance.  See also IND. CODE 13-25-2-7.

42.    Section 329(4) of EPCRA, 42 U.S.C. § 11049(4), and 40 C.F.R. § 355.20 define "facility" to mean, in relevant part, all buildings, equipment, structures, and other stationary items which are located on a single site and that are owned or operated by the same person.

43.    Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), provides that any person who violates the notice requirements of Section 304 of EPCRA, 42 U.S.C. § 11004, shall be liable to the United States for civil penalties.

44.    Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), authorizes EPA to assess a civil penalty of up to $25,000 per day of violation, and in the case of a second or subsequent violation $75,000 per day of violation, of EPCRA Section 304, 42 U.S.C. § 11004.  The Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701 *et seq*., and the Federal Civil Penalties

Inflation Adjustment Act Improvements Act of 2015, require EPA to periodically adjust its civil penalties for inflation.  On December 11, 2008, August 1, 2016, January 15, 2017, and January 15, 2018, EPA adopted and revised regulations entitled "Civil Monetary Penalty Inflation Adjustment Rule," 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under EPCRA.  For each violation that occurs after November 2, 2015, penalties of up to $62,689 per day may be assessed.  Additionally, in the case of a second or subsequent violation, for each violation that occurs after November 2, 2015, penalties of up to $188,069 per day may be assessed.  87 Fed. Reg. 1676 (Jan. 12, 2022).

45.    The provisions of IND. CODE §§ 13-30-4-1 and 13-14-2-6 authorize Indiana to commence a civil action "in any court with jurisdiction" for appropriate relief to address environmental violations, including violations of IND. CODE § 13-25-2.  Such relief may include a civil penalty of up to $25,000 per day for each violation.

### Provisions of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)

46.    CERCLA's immediate emergency notification requirements are designed to provide the government with information necessary to quickly evaluate the need for response action to prevent or mitigate damage to public health or welfare or the environment.

47.    Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), provides that:  "Any person in charge of . . . an onshore facility shall, as soon as he has knowledge of any release (other than a federally permitted release) . . . of a hazardous substance from such . . . facility in quantities equal to or greater than those determined pursuant to Section 9602 of this title, immediately notify the National Response Center . . . of such release."

48.    The Burns Harbor Facility is an "onshore facility" as defined in Section 101 of CERCLA, 42 U.S.C. § 9601(18), and 40 C.F.R. § 355.20.

10

49.    Section 104(a) of CERCLA, 42 U.S.C. § 9604(a), provides, among other things, that "[w]henever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant or contaminant at any time (including its removal from any contaminated natural resource) or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment."

50.    Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section:

    (1) the owner and operator of a vessel or a facility, . . . from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
    (A)    all costs of removal . . . action incurred by the United States Government . . . not inconsistent with the national contingency plan . . .;

51.    Section 109(c)(1) of CERCLA, 42 U.S.C. § 9609(c)(1), includes provisions for civil enforcement in United States District Court and judicial assessment of penalties.  CERCLA provides that EPA may commence a civil action in United States District Court to assess and recover a civil penalty for violation of the emergency reporting requirements for each day during which the violation continues.

52.    CERCLA authorizes a civil penalty of up to $25,000 per day for each violation and, in the case of a second or subsequent violation, of up to $75,000 for each day during which the violation continues. These amounts have been increased under the Debt Collection

Improvement Act of 1996, as implemented by the Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. Part 19, such that the statutory maximum penalties for the EPCRA/CERCLA violations addressed in this Complaint are $62,689 per day and $188,069 per violation per day (depending on when the violation occurred) in the case of a second or subsequent violation. 87 Fed. Reg. 1676 (Jan. 12, 2022).

53.    CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), provides in pertinent part: "In any such action [for recovery of costs] . . ., the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

54.    The President has delegated most of his authorities under CERCLA, including authorities under Sections 103(a), 104(a) and 107(a), 42 U.S.C. §§ 9603(a), 9604(a) and 9607(a), to the Administrator of EPA, who in turn has re-delegated them to the Regional Administrators of EPA and other officials, including the Director of Superfund Division for EPA Region 5.

## GENERAL ALLEGATIONS

55.    At all times relevant to this Complaint, Defendants or their predecessors have owned and operated the Burns Harbor Facility, a steel manufacturing and finishing facility, in Burns Harbor, Porter County, Indiana.

### The Burns Harbor Facility and its Outfalls

56.    The Burns Harbor Facility is one of the largest fully integrated steel mills in North America, with the capacity to produce approximately 5 million tons of raw steel per year.

57.    As an integrated steel mill, the Burns Harbor Facility is classified under Standard Industrial Classification Code 3312 (Integrated Steel Mill).  Facility operations include sintering, iron making, steel making, continuous casting, acid pickling, hot forming, cold rolling, alkaline

12

cleaning, and galvanizing. The Burns Harbor Facility's intermediate and final products include coke and coke making byproducts, sinter, molten iron, raw steel, steel slabs, hot rolled strip, plate, cold rolled strip, and hot dip galvanized strip.

58.    Under the authority of CWA Section 402(b), 33 U.S.C. § 1342(b) and IND. CODE § 13-13-5-1 (1), the State of Indiana issued to CCBH NPDES Permit number IN0000175 ("Permit") imposing terms and conditions on all discharges from the Burns Harbor Facility.

59.    A prior version of NPDES Permit No. IN0000175 was in effect from March 1, 2011 to June 30, 2016 ("2011 Permit"). IDEM renewed NPDES permit, No. IN0000175 in 2016, which came into effect on July 1, 2016, and remains in effect ("2016 Permit").

60.    Cleveland-Cliffs uses water for a number of steelmaking and pollution-control operations at the Facility. The Facility's NPDES Permit authorizes it to discharge treated wastewater, stormwater, and non-contact cooling water, as well as treated sanitary sewage wastewater from the Town of Burns Harbor's wastewater treatment plant, which is permitted under Operational Permit Number INJ060801.

61.    Cleveland-Cliffs operates one water treatment plant, called the Secondary Wastewater Treatment Plant ("SWTP"), to treat wastewater after the water has been used in various Facility processes. The SWTP treats the following process wastewaters prior to discharge: Sintering; Iron Making (Blast Furnaces C and D); Steel Making (Basic Oxygen Furnaces Nos. 1, 2, and 3); Vacuum Degassing; Continuous Casting (casters Nos. 1 and 2); Hot Forming (110" Plate Mill, 160" Plate Mill, and 80" Hot Strip Mill); Acid Pickling (Nos. 1 and 2 Picklers, Continuous Heat Treat Line); Cold Rolling (Tandem Mill and Temper Mill); Alkaline Cleaning (Continuous Heat Treat Line and Hot Dip Coating Line); Galvanizing (Hot

13

Dip Coating); and Landfill leachate from the Deerfield Retention Pond. The SWTP treatment includes pH adjustment, oil separation, flocculation/coagulation, and clarification.

62.    The Facility's NPDES Permit authorizes discharge via three external outfalls (Outfalls 001, 002, and 003). Outfall 001 discharges from the Facility to the East Branch of the Little Calumet River, Outfall 002 discharges from the Facility to Burns Harbor, and Outfall 003 discharges from the Facility to Lake Michigan.

63.    The Facility's NPDES Permit also authorizes discharge via two internal outfalls (Outfalls 011 and 111). Internal outfalls carry water from Facility processes or operations and are combined with other waters or waste streams prior to ultimate discharge from an external outfall.

64.    All discharges from the Facility's External Outfalls 001, 002, and 003, and Internal Outfalls 011 and 111, are subject to the terms and conditions of the Facility's NPDES Permit.

65.    Outfall 001 discharges into the East Branch of the Little Calumet River, which flows into Lake Michigan. The flow to Outfall 001 includes treated wastewater from the SWTP; treated sanitary sewage wastewater from the Town of Burns Harbor's wastewater treatment plant; and the flow from a storm ditch, which is comprised of non-contact cooling water, storm water, and Lake Michigan water. Between April 2015 and December 2019, Outfall 001 had an average discharge of approximately 121 million gallons per day ("MGD").

66.    Internal Outfall 011 is comprised of treated process wastewater from the Facility's SWTP and treated sanitary sewage wastewater from the Town of Burns Harbor. The effluent from the Town of Burns Harbor's wastewater treatment plant merges with the effluent from the SWTP and this combined wastestream is routed through two polishing lagoons prior to

14

discharge through Outfall 011.  Between April 2015 and December 2019, Internal Outfall 011 had an average discharge of approximately 65 MGD.  External Outfall 001 is approximately 600 feet downstream of Outfall 011.

67.    Outfall 002 discharges into Burns Harbor.  The discharge from Outfall 002 consists of noncontact cooling water, treated process wastewater from the lagoon re-circulating pump station, building dewatering, groundwater, miscellaneous non-process waters, and stormwater.  Between April 2015 and December 2019, Outfall 002 had an average discharge of approximately 197 MGD.

68.    Outfall 003 discharges to Lake Michigan.  The discharge from Outfall 003 consists of backwash from the No. 1 and 2 Lake Water Pump Station's traveling screens.  The traveling screens are used to filter Lake Michigan water that is taken into the Facility, before the lake water is used in the Facility's operations.  The screens are regularly backwashed, using Lake Michigan water again, and the backwash goes back out into Lake Michigan via Outfall 003.

69.    Internal Outfall 111 is an internal monitoring point from the final thickener at the Reclamation Services Building.  Its discharge is limited to treated process wastewater from the sinter plant and blast furnace hydrocyclone overheads.  This discharge flows to the SWTP, then to Outfall 011, then to the East Branch of the Little Calumet River through Outfall 001.

70.     The diagram below is a "Flow Diagram" included in the Fact Sheet for Cleveland-Cliffs' draft NPDES Permit currently being considered for renewal.  It shows the flow of water through the Facility, to the various outfalls.



**Burns Harbor Facility Blast Furnace and Wastewater Treatment and Recycle System**

71.     The Burns Harbor Facility has two blast furnaces, C Furnace and D Furnace, which are used for smelting and under normal circumstances run continuously.  Each furnace has a dust catcher and a wet scrubber to remove pollution from blast furnace gas.

72.     Wet scrubbers are air pollution control devices for removing pollutants from industrial exhaust gases.  A wet scrubber operates by introducing the dirty gas stream with a

scrubbing liquid, usually water.  At the Burns Harbor Facility, water is added to the dirty gas stream from the blast furnaces to collect the pollutants.

73.     The wet scrubber process generates wastewater that contains pollutants, including cyanide and ammonia.  The scrubber wastewater is recycled and reused for the Facility's wet scrubber process through a "closed loop" system in the blast furnace gas water recycling system ("Blast Furnace Gas Cleaning Recycle System" or "Recycle System").

74.     The Blast Furnace Gas Cleaning Recycle System includes pumps, wells, and other equipment, housed in the Blast Furnace Closed Water Pumping Station ("Pump Station"). The power source for the pumps is a 5,000-volt electrical feed.  The power source for the pump controls is a self-recharging 250-volt DC battery system ("Recycle Pump Control Battery").

75.     The closed loop Recycle System consists of two thickeners that clarify wastewater and remove certain pollutants, underground sewers connecting the thickeners to the Pump Station, and the Pump Station, which recirculates treated scrubber wastewater for reuse in the blast furnace wet scrubbers.  The Pump Station includes a hot well, cooling towers that cool the wastewater, and a cold well.

76.     Scrubber wastewater is clarified in the pair of 90-foot diameter thickeners.  The thickeners work by removing suspended solids from the scrubber wastewater.  Overflow from these thickeners flows by gravity through an underground sewer and into the Pump Station hot well.  Thickener "underflow," or settled sludge from the thickeners, goes to the Reclamation Services Building for dewatering and disposal of solids.

77.     Hot well water is conditioned and pumped to parallel cooling towers using two of three available AC-powered hot well lift pumps.  The cooled water then flows by gravity to the cold well.  There are four AC-powered cold well pumps.  One pump is typically operated with

the other three in standby mode.  Cold well water is pumped to the "C" and "D" scrubber pump houses to be reused in the wet scrubbers for the blast furnace gas.  This completes the recycle loop.

78.    Under normal operations, 200 to 500 gallons per minute ("GPM") of recycled scrubber wastewater is "blown down" (i.e. removed from the Recycle System) on an intermittent basis from the cold well to the SWTP to maintain chemical and hydraulic balances.  "Make-up" water (i.e. additional water from Lake Michigan) may be added to the wells to maintain balance within the Recycle System.

79.    In the event the Recycle System experiences elevated concentrations of cyanide, the scrubber wastewater that is blown down from the Recycle System can be directed to a cyanide treatment system to destroy cyanide before discharging to the SWTP.  It would typically be used when a furnace is being shut down or being brought back online after an extended outage, which can result in higher concentrations of cyanide in blast furnace gases during the startup period.

80.    The sole waste streams from the Recycle System to the SWTP authorized by the NPDES Permit are: (1) underflow from the thickeners that has been dewatered; and (2) treated blown down scrubber wastewater that has been blown down to maintain a hydraulic balance within the Recycle System.

81.    The blown down scrubber wastewater is piped from the Recycle System cold well to the SWTP.

82.    The SWTP is not designed to treat wastewater for cyanide or ammonia-nitrogen.

83.    The effluent from the SWTP is routed through two polishing lagoons prior to discharge via Internal Outfall 011. The lagoons are equipped with aerators for temperature

control. That discharge combines with other waste streams and is then discharged through Outfall 001 into the East Branch of the Little Calumet River.

**Use of Lake Michigan Water in the Recycle System on a "Once-Through" Basis**

84.     Using water from Lake Michigan in the wet scrubber process to remove pollution from blast furnace gas without recirculating it through the Recycle System is known as using water on a "once-through basis."

85.     Using water on a "once-through basis" causes thousands of gallons per minute of scrubber wastewater to enter the SWTP.

86.     In its NPDES permit applications, AMBH and Cleveland-Cliffs did not apply to IDEM to send once-through, unrecycled scrubber wastewater and its accompanying flows to the SWTP and then to Outfalls 011 and 001. As a result, Cleveland-Cliffs is not authorized under its Permit to send the waste stream of once-through, or unrecycled scrubber wastewater to the SWTP.

87.     If Cleveland-Cliffs' permit application had requested authorization to send the waste stream of once-through, unrecycled Lake Michigan scrubber wastewater to the SWTP, and then ultimately discharge that once-through water at Outfalls 011 and 001, Cleveland-Cliffs would have been obligated to fully characterize constituents present in such wastewater, as well as wastewater flows associated with this waste stream, so that the permit authorities could set forth applicable treatment and monitoring requirements in the Permit. *See* 40 CFR § 122.21(g)(7)(b).

**NPDES Permit Requirements**

88.     Relevant terms and conditions of the Facility's 2011 and 2016 Permits are contained in the following parts: Part I. A. Effluent Limitations and Monitoring Requirements;

19

Part I. B. Narrative Water Quality Standards; Part I C. Monitoring and Reporting; and PART II.

Standard Conditions for NPDES Permits A. 1. Duty to Comply; A. 2. Duty to Mitigate; B. 1.

Proper Operation and Maintenance; and C. Reporting Requirements.  Where there are

differences between the 2011 and 2016 Permits, that distinction is made below.

*NPDES Permit Part I. A: Effluent Limitations and Monitoring Requirements*

89.    The 2011 Permit, Part I.A., set effluent limits for the Burns Harbor Facility's

Outfall 001.  Relevant effluent limits are described below:

| Parameter | Monthly Average Load | Daily Maximum Load | Unit | Monthly Average Concentration | Daily Maximum Concentration | Unit |
|---|---|---|---|---|---|---|
| Phenols | 14 | 22 | lbs/day | | | |
| Copper | 21 | 40 | lbs/day | 0.018 | 0.035 | mg/L |
| | | | | | | |
| Mercury | 0.0015 | 0.0037 | lbs/day | 1.3 | 3.2 | ng/L |
| Lead | 21.0 | 41.0 | lbs/day | 18.0 | 36.0 | ug/L |
| Silver | 0.055 | 0.11 | lbs/day | 0.048 | 0.097 | ug/L |
| Zinc | 171 | 332 | lbs/day | 150 | 290 | ug/L |
| Total Residual Chlorine | 11 | 23 | lbs/day | 10 | 20 | ug/L |

| Parameter | Daily Minimum | Daily Maximum | Unit | | | |
|---|---|---|---|---|---|---|
| pH | 6.0 | 9.0 | s.u. | | | |

| Parameter | Month | Daily Maximum | Unit | | | |
|---|---|---|---|---|---|---|
| Temperature | Jan | 60 | degF | | | |
| | Feb | 60 | degF | | | |
| | Mar | 65 | degF | | | |
| | Apr | 71 | degF | | | |
| | May | 81 | degF | | | |
| | Jun | 86 | degF | | | |
| | Jul | 86 | degF | | | |
| | Aug | 86 | degF | | | |
| | Sep | 85 | degF | | | |
| | Oct | 80 | degF | | | |
| | Nov | 75 | degF | | | |
| | Dec | 65 | deg:F | | | |

90.    The 2016 Permit, Part I.A., set effluent limits for the Burns Harbor Facility's

Outfall 001.  Relevant effluent limits are described below:

| Parameter | Monthly Average Load | Daily Maximum Load | Unit | Monthly Average Concentration | Daily Maximum Concentration | Unit |
|---|---|---|---|---|---|---|
| Phenols | 14 | 22 | lbs/day | | | |
| Copper | 20 | 39 | lbs/day | 0.018 | 0.035 | mg/L |
| Silver | 0.054 | 0.11 | lbs/day | 0.048 | 0.097 | ug/L |
| Mercury | 0.0015 | 0.0037 | lbs/day | 1.3 | 3.2 | ng/L |
| Zinc | 169 | 326 | lbs/day | 150 | 290 | ug/L |
| Total Residual Chlorine | 11 | 23 | lbs/day | 10 | 20 | ug/L |
| Whole Effluent Toxicity | | | | 1.0 | 1.0 | TU |
| Free Cyanide (No Permit Limit in 2011-2016 Permit) | 5 | 9.9 | lbs/day | 4.4 | 8.8 | ug/L |
| **Parameter** | **Daily Minimum** | **Daily Maximum** | **Unit** | | | |
| pH | 6.0 | 9.0 | s.u. | | | |
| **Parameter** | **Month** | **Daily Maximum** | **Unit** | | | |
| Temperature | Jan | 60 | degF | | | |
| | Feb | 60 | degF | | | |
| | Mar | 65 | degF | | | |
| | Apr | 71 | degF | | | |
| | May | 81 | degF | | | |
| | Jun | 86 | degF | | | |
| | Jul | 86 | degF | | | |
| | Aug | 86 | degF | | | |
| | Sep | 85 | degF | | | |
| | Oct | 80 | degF | | | |
| | Nov | 75 | degF | | | |
| | Dec | 65 | deg:F | | | |

91.    Part I. F. of the 2016 Permit and Part I. E. of the 2011 Permit require Cleveland-

Cliffs to conduct quarterly bioassay tests on model organisms to monitor the toxicity of the

discharge from Outfall 001.  Pursuant to both the 2011 and 2016 Permits, if the effluent exceeds

21

1.0 chronic toxicity units (TU$_c$) during the tests on Ceriodaphnia dubia, or if the effluent exceeds 1.0 acute toxicity units (TU$_a$) this is deemed to be a demonstration of chronic toxicity from Outfall 001. Under both the 2011 and the 2016 Permit, toxicity will be demonstrated if the acute toxicity exceeds 1.0 TU$_a$ or chronic toxicity exceeds 1.0 TUc. A toxicity demonstration is a violation of the Permit and triggers the requirement for a confirmation toxicity test, followed by a Toxicity Reduction Evaluation.

92.    Part I.A.1. of the 2016 Permit (and of the 2011 Permit) sets the following effluent limitations for ammonia from Outfall 001:

| Parameter | Month | 7-Day Average Load | Daily Maximum Load | Unit | 7-Day Average Concentration | Daily Maximum Concentration | Unit |
|---|---|---|---|---|---|---|---|
| Ammonia | Jan | 720 | 915 | lbs/day | 0.68 | 0.86 | mg/L |
| | Feb | 645 | 910 | lbs/day | 0.72 | 1.02 | mg/L |
| | Mar | 940 | 1300 | lbs/day | 0.9 | 1.27 | mg/L |
| | Apr | 730 | 1030 | lbs/day | 0.82 | 1.16 | mg/L |
| | May | 680 | 970 | lbs/day | 0.74 | 1.05 | mg/L |
| | Jun | 650 | 920 | lbs/day | 0.62 | 0.87 | mg/L |
| | Jul | 375 | 540 | lbs/day | 0.36 | 0.51 | mg/L |
| | Aug | 385 | 540 | lbs/day | 0.37 | 0.52 | mg/L |
| | Sep | 550 | 775 | lbs/day | 0.82 | 1.16 | mg/L |
| | Oct | 635 | 900 | lbs/day | 0.67 | 0.95 | mg/L |
| | Nov | 530 | 680 | lbs/day | 0.47 | 0.6 | mg/L |
| | Dec | 635 | 900 | lbs/day | 0.9 | 1.27 | mg/L |

93.    Part I.A.2. of the 2016 Permit (and of the 2011 Permit) sets the following effluent

limitations for Outfall 002:

| Parameter | Monthly Average Load | Daily Maximum Load | Unit | Monthly Average Concentration | Daily Maximum Concentration | Unit |
|---|---|---|---|---|---|---|
| Total Residual Chlorine | 24 | 48 | lbs/day | 10 | 20 | ug/L |

| Parameter | Daily Minimum | Daily Maximum | Unit | | | |
|---|---|---|---|---|---|---|
| pH | 6.0 | 9.0 | s.u. | | | |

| Parameter | Month | Daily Maximum | Unit | | | |
|---|---|---|---|---|---|---|
| Temperature | Jan | 55 | degF | | | |
| | Feb | 57 | degF | | | |
| | Mar | 63 | degF | | | |
| | Apr | 69 | degF | | | |
| | May | 77 | degF | | | |
| | Jun | 82 | degF | | | |
| | Jul | 88 | degF | | | |
| | Aug | 90 | degF | | | |
| | Sep | 88 | degF | | | |
| | Oct | 81 | degF | | | |
| | Nov | 72 | degF | | | |
| | Dec | 63 | dee:F | | | |

94.    Part I.A.4 of the 2011 Permit sets the following effluent limitations for Internal

Outfall 011:

| Parameter | Monthly Average Load | Daily Maximum Load | Unit |
|---|---|---|---|
| TSS | 6,000 | 20,000 | lbs/day |
| Oil and Grease | | 6,000 | lbs/day |
| Total Cyanide | | 21 | lbs/day |
| Zinc | 34.6 | 99.7 | lbs/day |
| Total Residual Chlorine | | 4.42 | lbs/day |
| Naphthalene | | 0.66 | lbs/day |
| Tetrachloroethylene | | 0.99 | lbs/day |

23

95.     Part I.A.4 of the 2016 Permit sets the following effluent limitations for Internal

Outfall 011:

| Parameter | Monthly Average Load | Daily Maximum Load | Unit |
|---|---|---|---|
| TSS | 7,000 | 24,530 | lbs/day |
| O+G | | 5,584 | lbs/day |
| Total Cyanide | | 21 | lbs/day |
| Zinc | 28.4 | 85.2 | lbs/day |
| Total Lead | 19.8 | 40 | lbs/day |
| Total Residual Chlorine | | 4.32 | lbs/day |
| Naphthalene | | 0.402 | lbs/day |
| Tetrachloroethylene | | 0.602 | lbs/day |

96.     Part I.A.5 of the 2016 Permit (and of the 2011 Permit) sets the following effluent

limitations for 2,3,7,8- tetrachlorodibenzofuran ("2,3,7,8-TCDF") from Internal Outfall 111:

| Parameter | Daily Maximum Concentration | Unit |
|---|---|---|
| 2,3,7,8-TCDF | 10 | pg/L |

*NPDES Permit Part I. B: Narrative Water Quality Standards*

97.     Pursuant to Part I.B. of the Permit, the Facility is required to meet certain

narrative water quality standards.

98.     These narrative standards mandate that the Facility's "[d]ischarge . . . shall not

cause receiving waters, including the mixing zone, to contain substances, materials, floating

debris, oil, scum or other pollutants . . . that are in amounts sufficient to be unsightly or

deleterious . . . [or] that produce color, visible oil sheen, odor, or other conditions in such degree

as to create a nuisance."  The discharge shall also not be "in amounts sufficient to be acutely

toxic to, or to otherwise severely injure or kill aquatic life, or other animals, plants, or humans."

24

Outside the mixing zone, the discharge must not contain "substances in concentrations which …
are believed to be sufficient to injure, be chronically toxic to, or be carcinogenic, mutagenic, or
teratogenic to humans, animals, aquatic life, or plants."

*NPDES Permit Part I. C: Monitoring and Reporting*

99.     Pursuant to Part I.C.1 of the Permit, Cleveland-Cliffs is required to conduct
representative sampling of its effluent.

100.     Pursuant to Part I.C.2 of the Permit, Cleveland-Cliffs is required to submit federal
and state Discharge Monitoring Reports ("DMRs") to IDEM containing results of physical
outfall monitoring obtained during the previous month no later than the 28th day of the month
following each completed monitoring period.

101.     Pursuant to Part II.C.6.c of the Permit, Cleveland-Cliffs is required to certify
upon signing the monthly reports that the information is "to the best of [the signer's] knowledge
and belief, true, accurate, and complete."

*NPDES Permit Part II:  Standard Conditions for NPDES Permits – A. Duty to Mitigate and
B. Proper Operation and Maintenance*

102.     Part II.A.2 of the Permit imposes a "Duty to Mitigate" requiring Cleveland-Cliffs
"to take all reasonable steps to minimize or correct any adverse impact to the environment
resulting from noncompliance with this Permit."

103.     The "Duty to Mitigate" under Part II.A.2 of the Permit, during periods of
noncompliance, also imposes a duty to "conduct such accelerated or additional monitoring for
the affected parameters, as appropriate or requested by IDEM, to determine the nature and
impact of the noncompliance."

104.   The Facility's Permit Part II.B.1., "Proper Operation and Maintenance," states
that "[t]he permittee shall at all times maintain in good working order and efficiently operate all

25

facilities and systems (and related appurtenances) for the collection and treatment which are installed or used by the permittee and which are necessary for achieving compliance with the terms and conditions of this permit in accordance with (Indiana's) 327 IAC 5-2-8(9)."

*NPDES Permit Part II C: Standard Conditions for NPDES Permits – Reporting Requirements*

105.    Part II.C.3 of the Permit requires Cleveland-Cliffs to orally report to IDEM "any noncompliance which may pose a significant danger to human health or the environment as soon as the permittee becomes aware of the noncomplying circumstances."

106.    Part II.C.3 of the Permit provides that any noncompliance that meets the requirements of 327 IAC 2-6.1 shall be reported to IDEM within two hours from the time Cleveland-Cliffs becomes aware of it.  327 IAC 2-6.1 requires reporting and containment of spills of hazardous and objectionable substances that may damage the waters of the state and meets certain criteria.

107.    Part II.C.3 of the Permit requires Cleveland-Cliffs to report any of the following types of noncompliance to IDEM within 24 hours from the time Cleveland-Cliffs becomes aware of the noncompliance:

> (a) any unanticipated bypass of wastewater treatment systems that exceed any effluent limitation in the Permit;
> (b) any noncompliance which may pose a significant danger to human health or the environment.  Reports under this item shall be made as soon as the permittee becomes aware of the noncomplying circumstances;
> (c) any "upset," which is defined as "an exceptional incident in which there is unintentional and temporary noncompliance with technology-based permit effluent limitations because of factors beyond the reasonable control of the permittee;" or
> (d) a violation of a maximum daily discharge limitation for lead, zinc, total cyanide, mercury, phenols, copper, and silver.

108.    Part II.C.3 of the Permit requires Cleveland-Cliffs to provide IDEM a written submission within five days after Cleveland-Cliffs learns of the noncompliance.  The written submission shall contain a description of the noncompliance and its cause; the period of

noncompliance, including exact dates and times, and, if the noncompliance has not been

corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce

and eliminate the noncompliance and prevent its recurrence.

109.    Part II.C.4 of the Permit requires Cleveland-Cliffs to report all noncompliance not

covered by Part II.C.3 to IDEM in the next DMR.

*NPDES Permit Modifications*

110.    On May 10, 2012, IDEM approved a modification to the 2011 Permit (effective

June 1, 2012) to remove Outfall 009 from the Permit.

111.    On October 25, 2012, IDEM approved a modification to the 2011 Permit

(effective November 1, 2012) to include monitoring waivers for naphthalene and

tetrachloroethylene at Outfall 011, and to authorize the discharge of landfill leachate from the

Deerfield Retention Pond to the SWTP and subsequently to Outfall 011, then through Outfall

001 to the East Branch of the Little Calumet River.

112.    On May 22, 2013, IDEM approved another modification to the 2011 Permit

(effective June 1, 2013) to remove the effluent limits and monitoring for lead at Outfall 001; to

move the effluent limits for lead from final Outfall 001 to Internal Outfall 011; to correct the

compliance monitoring limits for total residual chlorine to be in compliance with 327 IAC 5-2-

11.6(h); and to remove the compliance schedule to achieve compliance with the effluent limits

for copper, lead and zinc at Outfall 001.

**Toxic Releases and Permit Violations**

Past Recycle System Incidents and Resulting Effluent Limitation Violations

113.    On information and belief, on or about May 5, 2015, and continuing for some

period of time thereafter, the Burns Harbor Facility used Lake Michigan water for C Furnace's

27

wet scrubber gas-washing on a once-through basis, without running the scrubber wastewater through the Recycle System.

114.    While conducting sampling as part of the permit renewal process in 2015, the Burns Harbor Facility had detections of free and total cyanide from Outfalls 001 and 011 while the Facility was using Lake Michigan water on a once-through basis.

115.    AMBH reported to IDEM in its August 27, 2015 NPDES permit renewal application that use of once-through water was "attributable to a short-term blast furnace operating issue."

116.    As reported to IDEM in its 2015 permit renewal application, as a result of this short-term blast furnace operating issue, the Burns Harbor Facility discharged total cyanide from Internal Outfall 011 at a concentration of 0.120 mg/L on May 5, 2015, and 0.056 mg/L on May 6, 2015.

117.    Using the reported concentration value of 0.120 mg/L and the reported flow of 63 MGD for May 5, 2015, that discharge resulted in approximately 63 pounds of total cyanide being discharged from Outfall 011, in excess of the 21 lbs/day limit.

118.    Using the reported concentration value of 0.056 mg/L and the reported flow of 83.7 MGD for May 6, 2015, that discharge resulted in approximately 39 pounds of total cyanide being discharged from Outfall 011, in excess of the 21 lbs/day limit.

119.    As set forth in Table 1, attached hereto as Appendix A, on May 5, 2015 and May 6, 2015, the Facility experienced total cyanide permit limit exceedances as a result of using once-through water in its blast furnace wet scrubber system.

120.    On May 5, 2015, May 6, 2015, May 18, 2015, and May 19, 2015, the Facility violated its Permit by sending once-through, unrecycled scrubber wastewater and its accompanying flows to the SWTP and then to Outfalls 011 and 001.

121.    On May 5, 2015, May 6, 2015, May 18, 2015 and May 19, 2015, the Facility failed to notify IDEM of high levels of cyanide in its effluent that could pose a significant danger to human health or the environment.

122.    AMBH later informed EPA and IDEM inspectors at an inspection on August 22, 2019, that the May 2015 shutdown of the Recycle System and resulting cyanide releases was caused by a power failure or a pump failure at the Pump Station.

123.    On numerous other occasions from 2014 to the present, the Facility reported exceedances of its ammonia effluent limitations during periods when the Recycle System was not operating and the Facility was using unrecycled Lake Michigan water in the scrubbers on a once-through basis.

124.    Based on the May 2015 cyanide releases and other instances of exceedances caused by the shutdown of the Recycle System, Defendants knew or should have known that using Lake Michigan water in the scrubbers on a once-through basis would result in significant cyanide and ammonia discharges upon discharge of the once-through water.

125.    Based on the May 2015 cyanide releases and other instances of exceedances caused by the shutdown of the Recycle System, Defendants knew or should have known that constant operation of the Recycle System is necessary to retain the pollutants in the Recycle System and to limit scrubber wastewater amounts being sent to the SWTP, and then to the Outfalls 011 and 001, to periodic blowdown.

29

August 4-5, 2019 Air Release Valve Failure Incident
and Resulting Effluent Limitation Violations

126.    On or about August 4, 2019, an air release valve at the Facility's Pump Station

failed and released pressurized water to the Pump Station.  The leaked water also infiltrated the

adjacent electrical substation.

127.    During the time that the air release valve was being repaired, the Facility was

forced to put the Recycle System out of service.

128.    During the time that the air release valve was being repaired and the Recycle

System was out of service, the Facility continued normal operations at the blast furnaces.

129.    As a result of the Recycle System being inoperable, the Facility used Lake

Michigan water on a once-through basis for the blast furnace wet scrubber system. After once-

through use for scrubbing, this scrubber wastewater was sent to the SWTP and ultimately

discharged through Outfalls 011 and 001.

130.    For over twelve hours, between the evening of August 4, 2019, and the afternoon

of August 5, 2019, while repairs were being performed in response to the valve failure, the

Facility discharged thousands of gallons per minute of once-through scrubber wastewater to

Outfall 001.

131.    AMBH took samples at Outfall 001 on August 5, 2019, but at the time did not test

those samples for ammonia-nitrogen.  On August 15, 2019, IDEM instructed the Facility to test

the August 5, 2019 samples for ammonia-nitrogen.  The Facility received the results from this

testing on August 19, 2019, and reported the results to IDEM on August 25, 2019.

132.    The testing of the August 5, 2019 samples showed an ammonia-nitrogen

concentration of 0.92 mg/l at Outfall 001, nearly two times the effluent concentration-based limit

allowed by the Permit.

30

133.    This exceedance was caused by the shutdown of the Recycle System and use of Lake Michigan water on a once-through basis.

134.    On August 4, 2019, and thereafter, the Facility failed to accelerate or increase its monitoring for pollutants that were elevated while the Recycle System was out of service.

135.    In particular, the Facility failed to test for cyanide on August 5, 2019, when elevated concentrations of cyanide would have been expected given the Recycle System shutdown.

136.    After the August 4, 2019 air release valve failure and shutdown of the Recycle System, the Facility continued standard operation of the blast furnaces and therefore did not reduce the rate or volume of scrubber wastewater being generated and sent to the SWTP.

137.    After the August 4, 2019 air release valve failure and shutdown of the Recycle System, the Facility did not make any changes to its operations that would mitigate the amount of pollutants being discharged through its outfalls.

138.    As set forth in Table 2, attached hereto in Appendix A, on August 5, 2019, the Burns Harbor Facility experienced ammonia exceedances that resulted from the air release valve failure and shutdown of the Recycle System.

139.    On August 4, 2019, the Facility violated its Permit by sending once-through, unrecycled scrubber wastewater and its accompanying flows to the SWTP and then to Outfalls 011 and 001.

140.    The Facility did not notify IDEM of its noncompliance within 24 hours of the August 4, 2019 incident that caused exceedances of effluent limitations in its Permit.

141.    The Facility never provided notice to the NRC regarding the August 5, 2019 ammonia release.

31

142.    The Facility did not provide immediate notice to the Indiana SERC or Porter County LEPC regarding the August 5, 2019 ammonia release.

143.    The Facility did not provide follow-up written notice within 30 days of the release to the Indiana SERC or Porter County LEPC regarding the August 5, 2019 ammonia release.

August 11-16, 2019 Pump Controls Incident, Resulting Release and Effluent Limitation
Violations, and Government Response

144.    When water was released in the Recycle System Pump Station due to the August 4, 2019 air release valve failure, some of the water flowed over the wall separating the room with the failed valve from the Recycle System electrical substation that houses equipment to supply power to the Pump Station.  The moisture from this flooding damaged and eventually caused a failure on the recharger for the battery power for the Recycle System pumps.

145.    On the morning of August 11, 2019, the batteries for the Recycle System pump controls completely lost charge and were unable to recharge, causing the Recycle System pumps to be inoperable.

146.    There was no alarm system in place at the Pump Station or elsewhere in the Burns Harbor Facility to alert operators that the batteries for the Recycle System pump controls had ceased charging after the August 4-5, 2019 incident, and therefore the Facility did not have the ability to know if the only source of power for the Recycle System pump controls was failing or was being depleted to a level that would cause the failure of the Recycle System pump controls.

147.    In response to the complete disabling of the Recycle System, the Facility switched to using Lake Michigan water in the wet scrubber system on a once-through basis.

148.    Due to other equipment failures, Lake Michigan "make-up" water also continued to flow into the Pump Station wells, despite the fact that the Recycle System was inoperable and this water was not being used in the wet scrubber process.

149.    Water levels in the flooded system continued to rise, resulting in an overflow of once-through scrubber wastewater through a standpipe in the thickener overflow sewer.  The water traveled through the standpipe to the SWTP.

150.    On August 11 and for the following four days, from August 12-15, 2019, during the Recycle System failure, the Burns Harbor Facility continued to send millions of gallons of scrubber wastewater to the SWTP and ultimately through Outfalls 011 and 001.

151.    Defendants knew, since at least the May 2015 incident, that the once-through scrubber wastewater would have high levels of cyanide.

152.    Defendants knew, from various incidents since at least 2014, that the once-through scrubber wastewater would have high levels of ammonia.

153.    On August 12, 2019, the Indiana Department of Natural Resources ("IDNR") received a citizen complaint of a distressed fish in the East Branch of the Little Calumet River. Both IDEM and IDNR investigated and observed a distressed fish.

154.    On the evening of August 13, 2019, IDEM and IDNR received additional complaints about the presence of numerous dead fish.  IDEM and IDNR conducted reconnaissance on Wednesday, August 14, 2019, and observed that a significant fish die-off had occurred.

155.    On August 14, 2019, IDEM initiated an investigation of the cause of the fish kill, which included conducting a field screening for various parameters, including ammonia, at locations along the East Branch of the Little Calumet River. One ammonia screening conducted at a location downstream of Outfall 001 indicated an ammonia concentration of 1.0 mg/l.

156.    On August 14, 2019, IDNR reported the spill to the National Response Center ("NRC").

33

157.    On August 15, 2019, the National Park Service and IDNR closed the public beaches at Ogden Dunes and the Indiana Dunes National Park.  The public beaches remained closed until August 22, 2019.

158.    On August 15, 2019, the Facility notified IDEM that it had violated the daily maximum limit for total cyanide.  In response to a directive from IDEM to identify the cause of the exceedances, the Facility stated that the Recycle System Pump Station had failed.

159.    On August 15, 2019, IDEM directed the Facility to conduct daily monitoring for all parameters at Outfalls 001 and 011, and to monitor the East Branch of the Little Calumet River for total and free cyanide, ammonia-nitrogen, pH, temperature, and dissolved oxygen.

160.    On August 16, 2019, AMBH called the NRC to report the release of ammonia and cyanide.  On the call to the NRC, AMBH claimed the release contained ammonia and cyanide, in unknown amounts.  AMBH also claimed the release was a federally-permitted release.

161.    On August 17, 2019, the United States Coast Guard ("USCG") and IDEM contacted EPA, requesting technical assistance and risk communication support.  EPA On-Scene Coordinator ("OSC") Ramon Mendoza ("OSC Mendoza") responded on Sunday, August 18, 2019, and attended the emergency response staff meeting.

162.    OSC Mendoza contacted the Agency for Toxic Substances and Disease Registry ("ATSDR"), to provide risk assessment/toxicology support to protect public health.

163.    On August 18, 2019, OSC Mendoza, with IDEM, collected samples at the Facility's Outfall 001, four locations along the East Branch of the Little Calumet River to the confluence with Lake Michigan, and along the western shoreline of Lake Michigan, at eight locations from the confluence to West Beach.  OSC Mendoza coordinated with the National Park Service (involved due to the public beach impacts and closings), the local water utility Indiana

34

American Water Company (involved due to the potential public water intake impacts), the EPA Drinking Water Program, and the Facility to reach agreement on a continued sampling program.

164.    On August 18, 2019, IDEM ordered the Facility to conduct additional daily sampling in the East Branch of the Little Calumet River, Burns Ditch up to the confluence with Lake Michigan, and along the western shore of Lake Michigan from the Riverwalk to West Beach (approximately two miles of lakeshore across Ogden Beach and Indiana Dunes National Lakeshore), until further notice.

165.    On August 22, 2019, eleven days after the beginning of the release, EPA Enforcement and Compliance Assurance Division enforcement officers Sangsook Choi and Joan Rogers, EPA Office of Compliance Assurance Division enforcement officer Mark Conti, and IDEM Inspector Nicholas Ream conducted a reconnaissance inspection of the site.

166.    Joan Rogers and Inspector Ream conducted another reconnaissance inspection on October 1, 2019, and a Compliance Evaluation Inspection on November 7-8, 2019.

167.    Based on the sampling required by IDEM after the Recycle System Pump Station failure, the Facility discharged cyanide and ammonia-nitrogen exceeding its NPDES permit limits for several days.  The Facility also exceeded weekly and monthly average limits for these pollutants.

168.    As set forth in Table 2, attached hereto in Appendix A, the Facility violated effluent limits for ammonia and cyanide from August 11 through August 16, 2019 at Outfalls 001 and 011.

169.    The Facility violated its Permit by sending once-through, unrecycled scrubber wastewater and its accompanying flows to the SWTP and then to Outfalls 011 and 001.

170.    The Facility did not notify IDEM of the conditions that may pose a significant danger to human health or the environment until August 15, 2019.

171.    The Facility did not properly maintain its Recycle System pumps and Pump Station equipment so as to ensure the operability of the Recycle System.  The resulting operational failure of Recycle System caused exceedances of cyanide and ammonia into the East Branch of the Little Calumet River.

172.    After the operational failure of Recycle System, the Facility failed to mitigate the adverse impacts from the failure of the Recycle System.  The Facility never scaled back operations, including blast furnace operations, or shut down the Facility to reduce or eliminate the amount of once-through scrubber wastewater being discharged.

173.    After the operational failure of Recycle System, the Facility failed to accelerate or increase monitoring in order to determine the nature and impact of the noncompliance.

174.    After the operational failure of Recycle System, the Facility did not provide notice to the NRC regarding the August 11-15 ammonia and cyanide releases until August 16, 2019, more than four days after the Facility had knowledge of the release.

175.    On September 11, 2019, the Facility submitted written reports to local and State emergency authorities, under requirements set forth in Section 304(a) of EPCRA, 42 U.S.C. § 11004(a), and CERCLA Section 103(a), about the levels of pollutants being discharged from the Burns Harbor Facility.

176.    In response to the release or threatened release of hazardous substances at or from the Burns Harbor Facility starting on August 11, 2019, EPA incurred a total of $10,025.37 in response costs.

36

177.    In response to the release or threatened release of hazardous substances at or from the Burns Harbor Facility starting on August 11, 2019, Indiana incurred a total of $37,650 in response costs.

178.    The United States and Indiana have not received payment of their response costs from Cleveland-Cliffs or any other party.

Outfall 002 Unpermitted Waste Stream

179.    On August 14, 2019, in response to a reported oil sheen, IDEM required the Facility to sample daily for oil and grease at Outfall 002.  After IDEM learned of the operational failure of the Recycle System, IDEM added additional daily sampling of total cyanide as a precautionary measure on August 16, 2019.

180.    The results of the Facility's sampling referenced in paragraph 179 above showed elevated concentrations of cyanide in discharges from Outfall 002.

181.    The Facility later reported to IDEM that an unpermitted waste stream from a landfill mixing pad at the Facility had been mistakenly routed to Outfall 002 in 2018, instead of being routed to the SWTP.

182.    The Facility did not report the presence of this waste stream or the presence of cyanide in its application to renew its NPDES Permit in 2015.

Other Effluent Violations

183.    As set forth in Table 3, attached hereto in Appendix A, DMRs submitted by the Facility show numerous other violations of Permit effluent limits from May 2015 to December 2019.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Effluent Violations)

184.    Paragraphs 1–183 are realleged and incorporated by reference.

185.    In August 2019, the Burns Harbor Facility discharged effluent through Outfall 001 that exceeded its daily maximum limit of 8.8 ug/L for free cyanide on five days, in violation of Part I.A. of its 2016 Permit.

186.    In August 2019, the Burns Harbor Facility discharged effluent through Outfall 001 that exceeded its monthly average of 5 lb/day for free cyanide that month, in violation of Part I.A. of its 2016 Permit.

187.    In August 2019, the Burns Harbor Facility discharged effluent through Outfall 001 that exceeded its monthly average of 4.4 ug/L for free cyanide that month, in violation of Part I.A. of its 2016 Permit.

188.    In August 2019, the Burns Harbor Facility discharged effluent through Outfall 001 that exceeded its daily maximum of 9.9 lb/day for free cyanide on five days, in violation of Part I.A. of its 2016 Permit.

189.    In May 2015, August 2019, December 2019, and October 2021, the Burns Harbor Facility discharged effluent through Outfall 011 that exceeded its daily maximum of 21 lbs/day for total cyanide on eight days, in violation of Part I.A. of its 2011 and 2016 Permits.

190.    On numerous occasions from 2016 to present, the Burns Harbor Facility discharged effluent through Outfall 001 that exceeded its 7-day maximum concentration for ammonia, in violation of Part I.A. of its 2011 and 2016 Permits.

191.    On numerous occasions from 2016 to present, the Burns Harbor Facility discharged effluent through Outfall 001 that exceeded its 7-day maximum mass loading for ammonia, in violation of Part I.A. of its 2011 and 2016 Permits.

192.    On numerous occasions from 2016 to present, the Burns Harbor Facility discharged effluent through Outfall 001 that exceeded its daily maximum concentration for ammonia, in violation of Part I.A. of its 2011 and 2016 Permits.

193.    On numerous occasions from 2016 to present, the Burns Harbor Facility discharged effluent through Outfall 001 that exceeded its daily maximum mass loading for ammonia, in violation of Part I.A. of its 2011 and 2016 Permits.

194.    In April and July 2018, and August and September 2021, the Burns Harbor Facility discharged effluent through Outfall 111 that exceeded its daily maximum permit limit of 10 pg/L for 2,3,7,8-Tetrachlorodibenzofuran on four days, in violation of Part I.A. of its 2016 Permit.

195.    In March 2018, the Burns Harbor Facility discharged effluent through Outfall 011 that exceeded its daily maximum of 5584 lbs/day of Oil and Grease on one day, in violation of Part I.A. of its 2016 Permit.

196.    In September 2017, the Burns Harbor Facility discharged effluent through Outfall 001 that exceeded its daily maximum of 22 lbs/day of Phenolics on one day, in violation of Part I.A. of its 2016 Permit.

197.    In July 2017, August 2017, February 2018, July 2018, and August 2018, the Burns Harbor Facility discharged effluent through Outfall 001 that exceeded its Temperature maximum on seventeen days, in violation of Part I.A. of its 2016 Permit.

198.    On numerous occasions in 2015, 2016, and 2020, the Burns Harbor Facility discharged effluent through Outfall 001 that exceeded 1.0 chronic toxicity units ($TU_c$) and/or 1.0 acute toxicity units ($TU_a$), in violation of Part I.A. and the narrative standard of its 2011 and 2016 NPDES Permits.

199.    Each one of Defendants' CWA violations enumerated above, and set forth in Appendix A, Tables 1, 2, and 3, subjects Defendants to appropriate relief, including a permanent or temporary injunction, under CWA Section 309(b), 33 U.S.C. § 1319(b) and IND. CODE §§ 13-30-1-1; 13-30-4-1(b)(2).

200.    Each violation of the CWA is subject to penalties pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and the Civil Penalties Inflation Act of 1990, of up to $37,500 per day for each violation on and after January 13, 2009 through November 2, 2015 and $59,973 per day for each violation occurring after November 2, 2015. 87 Fed. Reg. 1676 (Jan. 12, 2022). 33 U.S.C. §§ 1311; 40 C.F.R. §§ 19.1-19.4 and IND. CODE § 13-30-4-1.

### SECOND CLAIM FOR RELIEF
### (Unpermitted Waste Streams)

201.    Paragraphs 1–183 are realleged and incorporated by reference.

202.    40 C.F.R. § 122.21(g) requires permit applicants to identify "each type of process, operation, or production area which contributes wastewater to the effluent for each outfall," along with average flows and a description of the treatment the wastewater receives.  An applicant must also provide "[a] line drawing of the water flow through the facility with a water balance, showing operations contributing wastewater to the effluent and treatment units."

203.    From at least 2018 until 2020, Cleveland-Cliffs routed an unpermitted waste stream from a landfill mixing pad to Outfall 002, rather than the SWTP and then Outfalls 011 and 001, in violation of its 2011 and 2016 Permits.

40

204.    On numerous occasions, including in May 2015 and August 2019, Cleveland-Cliffs routed millions of gallons of once-through, unrecycled scrubber wastewater to the SWTP and then Outfalls 011 and 001, in violation of its 2011 and 2016 Permits.  The 2011 and 2016 Permits allow for periodic blowdown of recycled scrubber wastewater and do not allow the waste stream of once-through, unrecycled scrubber wastewater, which was not identified or characterized in Cleveland-Cliffs' permit application.

205.    Each one of these CWA violations subjects Defendants to appropriate relief, including a permanent or temporary injunction, under CWA Section 309(b), 33 U.S.C. § 1319(b) and IND. CODE §§ 13-30-1-1; 13-30-4-1(b)(2).

206.    Each violation of the CWA is subject to penalties pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and the Civil Penalties Inflation Act of 1990, of up to $37,500 per day for each violation on and after January 13, 2009 through November 2, 2015 and $59,973 per day for each violation occurring after November 2, 2015.  33 U.S.C. §§ 1311, 1365; 40 C.F.R. §§ 19.1-19.4 and IND. CODE § 13-30-4-1.

**THIRD CLAIM FOR RELIEF**
**(Narrative Standard Violations)**

207.    Paragraphs 1–183 are realleged and incorporated by reference.

208.    In May 2015 and August 2019, the Burns Harbor Facility discharged effluent with elevated levels of cyanide and ammonia through Outfall 001 in violation of the permit narrative standard of its 2011 and 2016 NPDES Permits that the discharge shall not cause receiving waters, including the mixing zone, to contain pollutants in amounts sufficient to be acutely toxic to, or otherwise severely injure or kill aquatic life.

209.    Each one of these CWA violations subjects Defendants to appropriate relief, including a permanent or temporary injunction, under CWA Section 309(b), 33 U.S.C. § 1319(b) and IND. CODE §§ 13-30-1-1; 13-30-4-1(b)(2).

210.    Each violation of the CWA is subject to penalties pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and the Civil Penalties Inflation Act of 1990, of up to $37,500 per day for each violation on and after January 13, 2009 through November 2, 2015 and $59,973 per day for each violation occurring after November 2, 2015.  33 U.S.C. §§ 1311, 1365; 40 C.F.R. §§ 19.1-19.4 and IND. CODE § 13-30-4-1.

## FOURTH CLAIM FOR RELIEF
### (Monitoring and Reporting Violations)

211.    Paragraphs 1–183 are realleged and incorporated by reference.

212.    Part II.C.3 of the Permit requires Cleveland-Cliffs to orally report to IDEM "any noncompliance which may pose a significant danger to human health or the environment as soon as the permittee becomes aware of the noncomplying circumstances."

213.    327 IAC 2-6.1-5(4) requires Cleveland-Cliffs to report "spills to surface waters that include . . . hazardous substances or extremely hazardous substances when the amount spilled exceeds one hundred (100) pounds or the reportable quantity, whichever is less." Pursuant to 327 IAC 2-6.1-7(3), upon discovery of a reportable spill, Cleveland-Cliffs was required to "[a]s soon as possible, but within two (2) hours of discovery, communicate a spill report to [IDEM]."

214.    Cleveland-Cliffs violated its 2011 and 2016 NPDES Permits on at least six occasions for failing to notify IDEM, as soon as they became aware, of any noncompliance that may pose a significant danger to human health or the environment occurring on May 15, 2015, and August 5 and 11-16, 2019.

42

215.    On these same occasions, Cleveland-Cliffs also violated 327 IAC 2-6.1 by failing to notify IDEM, as soon as they became aware, of a reportable spill to surface waters.

216.    Each one of Defendants' violations enumerated above subjects Defendants to appropriate relief, including a permanent or temporary injunction, under CWA Section 309(b), 33 U.S.C. § 1319(b) and IND. CODE §§ 13-30-1-1; 13-30-4-1(b)(2).

217.    Each violation of the CWA is subject to penalties pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and the Civil Penalties Inflation Act of 1990, of up to $37,500 per day for each violation on and after January 13, 2009 through November 2, 2015 and $59,973 per day for each violation occurring after November 2, 2015. 87 Fed. Reg. 1676 (Jan. 12, 2022). 33 U.S.C. §§ 1311, 1365; 40 C.F.R. §§ 19.1-19.4 and IND. CODE §13-30-4-1.

### FIFTH CLAIM FOR RELIEF
### (Operation and Maintenance Violations)

218.    Paragraphs 1–183 are realleged and incorporated by reference.

219.    Permit Part II.B.1., "Proper Operation and Maintenance," states that "[t]he permittee shall at all times maintain in good working order and efficiently operate all facilities and systems (and related appurtenances) for the collection and treatment which are installed or used by the permittee and which are necessary for achieving compliance with the terms and conditions of this permit in accordance with (Indiana's) 327 IAC 5-2-8(9)."

220.    Cleveland-Cliffs violated its NPDES Permit by failing at all times to maintain in good working order and efficiently operate facilities and systems (and related appurtenances) for the collection and treatment which are installed or used by the permittee and which are necessary for achieving compliance with the terms and conditions of the Permit.

221.    On August 4 and August 11-15, 2019, Cleveland-Cliffs had equipment failures that resulted in exceedances of the effluent limits in its NPDES Permit.

222.    On August 4, 2019 and August 11-15, 2019, Cleveland-Cliffs failed to maintain in good working order and to efficiently operate all facilities and system to maintain compliance with its NPDES Permit.

223.    From at least May 2015 to December 31, 2019, the Burns Harbor Facility has not had sufficient power sources or alarm systems for its Recycle System and Pump Station.

224.    From at least May 2015 to the present, the Burns Harbor Facility has not had the ability to treat once-through scrubber wastewater from the blast furnace air scrubber system should the Recycle System or Pump Station become inoperable.

225.    Each one of Defendants' CWA violations enumerated above, and identified in Appendix A, subjects Defendants to appropriate relief, including a permanent or temporary injunction, under CWA Section 309(b), 33 U.S.C. § 1319(b) and IND. CODE §§ 13-30-1-1; 13-30-4-1(b)(2).

226.    Each violation of the CWA is subject to penalties pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and the Civil Penalties Inflation Act of 1990, of up to $37,500 per day for each violation on and after January 13, 2009 through November 2, 2015 and $59,973 per day for each violation occurring after November 2, 2015.  33 U.S.C. §§ 1311, 1365; 40 C.F.R. §§ 19.1-19.4 and IND. CODE § 13-30-4-1.

### SIXTH CLAIM FOR RELIEF
### (Duty to Mitigate)

227.    Paragraphs 1–183 are realleged and incorporated by reference.

228.    Part II.A.2 of the 2016 Permit imposes a "Duty to Mitigate" requiring Cleveland-Cliffs "to take all reasonable steps to minimize or correct any adverse impact to the environment resulting from noncompliance with this Permit."

44

229.    In August 2019, Cleveland-Cliffs did not make changes to its operations over five days that would have mitigated the Recycle System failure's adverse impact to the environment and decreased the amount of pollutants being discharged through its outfalls, including but not limited to a temporary shut-down of the blast furnace operations.

230.    The "Duty to Mitigate" under Part II.A.2 of the Permit, during periods of noncompliance, also imposes a duty to "conduct such accelerated or additional monitoring for the affected parameters, as appropriate or requested by IDEM, to determine the nature and impact of the noncompliance."

231.    In August 2019, Cleveland-Cliffs violated its Permit by failing to accelerate or increase its monitoring of pollutants when the Recycle System was inoperable, in order to determine the nature and impact of the noncompliance.

232.    Each one of these CWA violations, subjects Defendants to appropriate relief, including a permanent or temporary injunction, under CWA Section 309(b), 33 U.S.C. § 1319(b) and IND. CODE §§ 13-30-1-1; 13-30-4-1(b)(2).

233.    Each violation of the CWA is subject to penalties pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and the Civil Penalties Inflation Act of 1990, of up to $37,500 per day for each violation on and after January 13, 2009 through November 2, 2015 and $59,973 per day for each violation occurring after November 2, 2015. 87 Fed. Reg. 1676 (Jan. 12, 2022). 33 U.S.C. § 1311; 40 C.F.R. §§ 19.1-19.4 and IND. CODE § 13-30-4-1.

### SEVENTH CLAIM FOR RELIEF
**(Failure to Immediately Report a Release of a Hazardous Substance above the Reportable Quantity to the NRC)**

234.    Paragraphs 1–183 are realleged and incorporated by reference.

235.     Section 103(a) of CERCLA provides that "[a]ny person in charge of . . . an onshore facility shall, as soon as he has knowledge of any release (other than a federally permitted release) . . . of a hazardous substance from such . . . facility in quantities equal to or greater than those determined pursuant to Section 9602 of this title, immediately notify the National Response Center . . . of such release."

236.     On August 5, 2019, and August 11-15, 2019, there were "releases" within the meaning of CERCLA Sections 101(21), 103(a), and 107, 42 U.S.C. §§ 9601(21), 9603(a) and 9607, at the Burns Harbor Facility.  During this time, the hazardous substance ammonia was released in an amount greater than its Reportable Quantity of 100 pounds over a 24-hour period, as set forth in the table at 40 CFR § 302.4.

237.     On August 12-16, 2019, there were "releases" within the meaning of CERCLA Sections 101(21), 103(a), and 107, 42 U.S.C. §§ 9601(21), 9603(a) and 9607, at the Burns Harbor Facility.  During this time, the hazardous substance cyanide was released in an amount greater than its Reportable Quantity of 10 pounds over a 24-hour period, as set forth in the table at 40 CFR § 302.4.

238.     The August 2019 ammonia and cyanide releases required Cleveland-Cliffs to provide immediate notification to the NRC under Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).  It was not a "federally permitted release" as that term is used in Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), and 40 C.F.R. § 302.6, and defined in Section 101(10) of CERCLA, 42 U.S.C. § 9601(10).

239.     The Burns Harbor Facility had ammonia releases on five days in August 2019 (August 5, August 11-13, and August 15). A breakdown of the ammonia releases is provided in

Appendix B, Table 1. Each release was above the 100-pound threshold for immediate reporting to the NRC and thus required notice under Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

240.    The Burns Harbor Facility had cyanide releases on five days in August 2019 (August 12-16). A breakdown of the cyanide releases is provided in Appendix B, Table 2. Each release was above the ten-pound threshold for immediate reporting to the NRC and thus required notice under Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

241.    Cleveland-Cliffs had knowledge within the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), of the August 2019 ammonia and cyanide releases at or about the time the releases occurred.

242.    Cleveland-Cliffs never provided notice to the NRC regarding the August 5, 2019 ammonia release. Cleveland-Cliffs did not provide notice to the NRC regarding the August 11-16, 2019 ammonia and cyanide releases until August 16, 2019, more than four days after Defendants had knowledge of the release.

243.    Cleveland-Cliffs failed to provide immediate notification to the NRC of the August 2019 ammonia and cyanide releases, in violation of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

244.    Each violation of CERCLA is subject to penalties under Section 109(c)(1) of CERCLA, 42 U.S.C. § 9609(c)(1), and the Civil Penalties Inflation Act of 1990, 40 C.F.R. §§ 19.1-19.4, of up to $62,689 per day for each violation and, in the case of a second or subsequent violation, of up to $188,069 for each day during which the violation continues.

**EIGHTH CLAIM FOR RELIEF**
**(Failure to Immediately Report a Release of a Hazardous Substance above the Reportable Quantity to the Indiana SERC and Porter County LEPC)**

245.    Paragraphs 1–183 are realleged and incorporated by reference.

47

246.    Section 304(a)(1) of EPCRA provides that "[i]f a release of an extremely hazardous substance… occurs from a facility at which a hazardous chemical is produced, used, or stored and such release requires a notification under Section 103(a) of CERCLA… the owner or operator of the facility shall immediately provide notice as described in subsection (b) of this Section . . . " to the SERC of any state likely to be affected by the release and to the LEPC of any area likely to be affected by the release.

247.    Section 304(a)(3) of EPCRA provides that "[i]f a release of a substance which is not [an extremely hazardous substance] occurs at a facility at which a hazardous chemical is produced, used, or stored, and such release requires a notification under Section 103(a) of CERCLA, the owner or operator shall provide notice . . . if the substance is one for which a reportable quantity has been established under Section 102(a) of CERCLA." Defendants are required to immediately report releases under EPCRA to the Indiana SERC and the Porter County LEPC.

248.    IND. CODE 13-25-2-6(b) provides that "[i]f a release of an extremely hazardous substance occurs from a facility at which a hazardous chemical is produced, used, or stored; and the release requires notification under 42 U.S.C. 9603(a); the owner or operator of the facility shall immediately provide notice as described in section 7 of this chapter."

249.    IND. CODE 13-25-2-6(d) provides that "[i]f a release of a substance which is not [an extremely hazardous substance] occurs from a facility at which a hazardous chemical is produced, used, or stored, and the release requires notification under 42 U.S.C. 9603(a), the owner or operator shall provide notice . . . as described in Section 7 of this chapter . . ." if a reportable quantity has been established for the substance under 42 U.S.C. 9602(a).

250.    On August 5, 2019 and August 11-15, 2019, ammonia releases within the meaning of Section 103(a) of CERCLA, Section 304(a)(1) of EPCRA, and IND.CODE 13-25-2-6(b) occurred at the Burns Harbor Facility.  A breakdown of the ammonia releases is provided in Appendix B, Table 1.

251.    On August 12-16, 2019, cyanide releases within the meaning of Section 103(a) of CERCLA, Section 304(a)(1) of EPCRA, and IND.CODE 13-25-2-6(b) occurred at the Burns Harbor Facility.  A breakdown of the cyanide releases is provided in Appendix B, Table 2.

252.    Cyanide and ammonia are hazardous substances under CERCLA.  In addition to being a hazardous substance, ammonia is an "extremely hazardous substance" listed at 40 C.F.R. Part 355, Appendix A.  Both cyanide and ammonia are subject to EPCRA emergency reporting requirements under 40 C.F.R. § 355.30(b) and the Indiana Emergency Planning and Notification requirements at IND. CODE 13-25-2.

253.    Cleveland-Cliffs was required to immediately report the releases under EPCRA and IND. CODE 13-25-2-6 to the Indiana SERC and the Porter County LEPC.  The areas subject to the jurisdiction of the SERC, the Indiana Emergency Response Commission, and the LEPC, the Porter County Emergency Planning Commission, were likely to be affected by the releases.

254.    Cleveland-Cliffs had knowledge within the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), and Section 304(a) of EPCRA, 42 U.S.C. § 11004(a) and (c), of the ammonia and cyanide releases at or about the time the releases occurred.

255.    Cleveland-Cliffs never provided notice to the Indiana SERC or Porter County LEPC regarding the August 5, 2019 ammonia release.  Defendants did not provide notice to the Indiana SERC or Porter County LEPC regarding the August 11-16 ammonia and cyanide releases until August 16, more than four days after Defendants had knowledge of the release.

49

256.    Cleveland-Cliffs failed to provide immediate notification to the Indiana SERC and Porter County LEPC of the August 2019 releases identified above, in violation of Section 304(a) of EPCRA, 42 U.S.C. § 11004 and IND. CODE 13-25-2-6.

257.    Each violation of EPCRA is subject to penalties under Section 325(b)(3), 42 U.S.C. § 11045(b)(3), and the Civil Penalties Inflation Act of 1990, 40 C.F.R. §§ 19.1-19.4, of up to $62,689 per day for each violation and, in the case of a second or subsequent violation, of up to $188,069 for each day during which the violation continues.  Pursuant to IND. CODE 13-30-4-1, each violation of Indiana's environmental management laws, including the Emergency Planning and Notification provisions at IND. CODE 13-25-2, is subject to penalties of up to $25,000 per day of any violation.

**NINTH CLAIM FOR RELIEF**
**(Failure to File a Written Follow-Up Report to the Indiana SERC and Porter County LEPC)**

258.    Paragraphs 1–183 are realleged and incorporated by reference.

259.    Section 304(c) of EPCRA, 42 U.S.C. § 11004(c), requires the owner and operator of a facility at which a hazardous chemical is produced, used, or stored, to provide follow-up written emergency notice to the SERC and LEPC of certain specified releases of a hazardous or extremely hazardous substance.

260.    IND. CODE 13-25-2-7 requires the owner and operator of a facility at which a hazardous chemical is produced, used, or stored, to provide follow-up written emergency notice to the SERC and LEPC as soon as practicable after a release that requires notice under IND. CODE 13-25-2-6.

261.    On August 5, 2019, there was a "release" within the meaning of Section 304(a) and (c) of EPCRA, 42 U.S.C. § 1104(a) and (c), and IND. CODE 13-25-2, at the Burns Harbor

Facility. During this time, the hazardous substance ammonia was released in an amount greater than its reportable quantity of 100 pounds over a 24-hour period, as set forth in the table at 40 CFR § 302.4.

262.    The August 5 release of 852 pounds of ammonia was above the 100-pound threshold for immediate reporting under Section 304(a) of EPCRA, 42 U.S.C. § 11004(a), and IND. CODE 13-25-2-6(b). As such, this release required a follow-up written report under Section 304(c) of EPCRA, 42 U.S.C. § 11004(c), and IND. CODE 13-25-2-7.

263.    The areas subject to the jurisdiction of the SERC, the Indiana Emergency Response Commission, and the LEPC, the Porter County Emergency Planning Commission, were likely to be affected by the release.

264.    Cleveland-Cliffs had knowledge within the meaning of Section 304(a) of EPCRA, 42 U.S.C. § 11004(a), of the release at or about the time the release occurred.

265.    Cleveland-Cliffs failed to provide written follow-up emergency notice to the Indiana SERC and the Porter County LEPC of the August 5, 2019 ammonia release, in violation of Section 304(c) of EPCRA, 42 U.S.C. § 11004(c), and IND. CODE 13-25-2-7.

266.    The violation above is subject to penalties under Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701 *et seq*., the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, and the Civil Monetary Penalty Inflation Adjustment Rule (87 Fed. Reg. 1676 (Jan. 12, 2022)), of up to $62,689 per day. Pursuant to IND. CODE 13-30-4-1, each violation of Indiana's environmental management laws, including the Emergency Planning and Notification provisions at IND. CODE 13-25-2, is subject to penalties of up to $25,000 per day of any violation.

## TENTH CLAIM FOR RELIEF
### (Liability for Response Costs)

267.    Paragraphs 1–183 are realleged and incorporated by reference.

268.    The Burns Harbor Facility is a "facility" within the meaning of Sections 107(a) and 101(9) of CERCLA, 42 U.S.C. §§ 9607(a) and 9601(9).

269.    The Defendants are both the "owner and operator" of the Burns Harbor Facility within the meaning of CERCLA Sections 107(a)(1) and 101(20), 42 U.S.C. §§ 9607(a)(1) and 9601(20).

270.    Cyanide and ammonia nitrogen are "hazardous substances" within the meaning of Sections 107(a) and 101(14) of CERCLA, 42 U.S.C. §§ 9607(a) and 9601(14).  *See* 40 C.F.R. § 302.4 (App. A).

271.    A "release" or "threatened release" of "hazardous substances" into the environment has occurred at and/or from the Burns Harbor Facility, as those terms are defined in Section 101(14) and 101(22) of CERCLA, 42 U.S.C. § 9601(14) and (22).

272.    IND. CODE 13-25-6-2 requires responsible parties to reimburse government entities for reasonable and necessary expenses incurred in taking emergency action at or near the scene of the hazardous materials emergency.

273.    In conducting "removal" actions in response to the August 2019 release, the United States has incurred "response" costs within the meaning of Sections 107(a), 101(6), 101(23) and 101(25) of CERCLA, 42 U.S.C. §§ 9607(a), 9601(6), 9601(23) and 9601(25).

274.    The United States' activities related to the August 2019 unpermitted discharges of cyanide and ammonia nitrogen and the costs incurred incident to such action are not inconsistent with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300, as promulgated under Section 105(a) of CERCLA, 42 U.S.C. § 9605(a).

275.    Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Defendants are liable to the United States for all response costs that the United States has incurred and will incur with respect to the August 2019 unpermitted discharges of cyanide and ammonia nitrogen, including prejudgment interest.

276.    Pursuant to IND. CODE 13-25-6, Defendants are liable to Indiana for all reasonable and necessary expenses incurred by Indiana with respect to the August 2019 unpermitted discharges of cyanide and ammonia nitrogen.

277.    Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), the United States is entitled to recover interest on the response costs that it has incurred with respect to the August 2019 releases of cyanide and ammonia, at the rate that is specified for interest on investments of the Hazardous Substances Superfund established under subchapter A of chapter 98 of title 26 of the United States Code.

278.    Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), the United States is entitled to a declaratory judgment on liability for response costs that will be binding on any subsequent action or actions to recover further response costs.

## PRAYER FOR RELIEF

WHEREFORE, based upon all of the allegations set forth above, the United States of America and the State of Indiana respectfully requests that this Court:

1.    Permanently enjoin Defendants from further violations of the CWA, CERCLA and EPCRA and applicable requirements established thereunder, including the NPDES permits described above;

2.    Require Defendants to obtain and comply with all actions necessary to achieve and maintain compliance with the CWA, CERCLA, and EPCRA, and applicable requirements established thereunder, including the NPDES permits described above;

3.      Assess civil penalties against Defendants pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and the Civil Penalties Inflation Act of 1990, for the violations set forth in Claims 1 through 5 of this Complaint;

4.      Assess civil penalties against Defendants pursuant to Section 109(c)(1) of CERCLA, 42 U.S.C. § 9609(c)(1), and the Civil Penalties Inflation Act of 1990, for the violations set forth in Claim 7 of this Complaint;

5.      Assess civil penalties against Defendants pursuant to Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), and the Civil Penalties Inflation Act of 1990, for the violations set forth in Claims 8 and 9 of this Complaint;

6.      Enter judgment in favor of the United States, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), holding Defendants liable for all unreimbursed response costs incurred by the United States with respect to the August 2019 releases, including enforcement costs, and interest thereon;

7.      Enter a judgment in favor of the State of Indiana, holding Defendants liable under IND. CODE 13-25-6-2 for all unreimbursed response costs incurred by Indiana with respect to the August 2019 releases;

8.      Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), enter a declaratory judgment on liability against the Defendants for response costs that will be binding on any subsequent action or actions to recover further response costs;

9.      Award the United States of America and the State of Indiana their costs and disbursements for this action; and

10.     Grant such other relief as the Court deems just and proper.

Respectfully Submitted,


FOR THE UNITED STATES OF AMERICA


     TODD KIM
     Assistant Attorney General
     Environment and Natural Resources Division


     s/ Nicholas A. McDaniel
     NICHOLAS A. MCDANIEL
     Trial Attorney
     Environmental Enforcement Section
     Environment and Natural Resources Division
     United States Department of Justice
     P.O. Box 7611
     Washington, DC  20044-7611
     (202) 514-0096
     Nicholas.a.mcdaniel@usdoj.gov


     CLIFFORD D. JOHNSON
     United States Attorney

     WAYNE T. AULT
     Assistant United States Attorney
     Northern District of Indiana
     5400 Federal Plaza, Suite 1500
     Hammond, Indiana  46320
     Telephone:  219-937-5500
     Telecopy:  219-852-2770
     Wayne.Ault@usdoj.gov

FOR THE STATE OF INDIANA

TODD ROKITA
Attorney General of Indiana
Attorney No. 18857-49

By:

s/ Adam C. Steel
ADAM C. STEEL
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., IGCS 5th Floor
Indianapolis, IN 46204
Phone: 317-234-7128
Adam.Steel@atg.in.gov

**APPENDIX A**
TABLE OF VIOLATIONS

**Table 1**: Summary of May 2015 Effluent Violations:

| Date | Violation | Outfall | Permit Limit | DMR Value | Units |
|------|-----------|---------|-------------|-----------|-------|
| 5/5/15 | Cyanide, total [as CN] – pounds per day | 011 | 21 | 75 (Not reported on DMR) | lb/day |
| 5/6/15 | Cyanide, total [as CN] – pounds per day | 011 | 21 | 35 (Not reported on DMR) | lb/day |

**Table 2**: Summary of August 2019 Effluent Violations:

| Date | Violation | Outfall | Permit Limit | DMR Value | Units |
|------|-----------|---------|-------------|-----------|-------|
| 08/05/19 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.52 | 0.92 | mg/L |
| 08/05/19 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 901 | lb/day |
| 08/07/19 | Nitrogen, ammonia total [as N] - 7 Daily Max mg/L | 001 | 0.37 | 0.41 | mg/L |
| 08/07/19 | Nitrogen, ammonia total [as N] - 7 Daily Max pounds per day | 001 | 385 | 459 | lb/day |
| 08/11/19 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.52 | 0.92 | mg/L |
| 08/11/19 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 911 | lb/day |
| 08/12/19 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.52 | 1 | mg/L |
| 08/12/19 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 1117 | lb/day |
| 08/12/19 | Cyanide, free [amen. to chlorination] - Daily Max ug/L | 001 | 8.8 | 160 | ug/L |
| 08/12/19 | Cyanide, free [amen. to chlorination] - pounds per day | 001 | 9.9 | 178.8 | lb/day |
| 08/13/19 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.52 | 0.8 | mg/L |
| 08/13/19 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 891 | lb/day |
| 08/13/19 | Cyanide, free [amen. to chlorination] - Daily Max ug/L | 001 | 8.8 | 220 | ug/L |

57

| | | | | | |
|---|---|---|---|---|---|
| 08/13/19 | Cyanide, free [amen. to chlorination] - pounds per day | 001 | 9.9 | 244.9 | lb/day |
| 08/14/19 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.52 | 0.57 | mg/L |
| 08/14/19 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 562 | lb/day |
| 08/14/19 | Nitrogen, ammonia total [as N] - 7 Day Max mg/L | 001 | 0.37 | 0.65 | mg/L |
| 08/14/19 | Nitrogen, ammonia total [as N] - 7 Day Max pounds per day | 001 | 385 | 679 | lb/day |
| 08/14/19 | Cyanide, free [amen. to chlorination] - Daily Max ug/L | 001 | 8.8 | 106.03 | ug/L |
| 08/14/19 | Cyanide, free [amen. to chlorination] - pounds per day | 001 | 9.9 | 104.9 | lb/day |
| 08/15/19 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.52 | 0.81 | mg/L |
| 08/15/19 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 751 | lb/day |
| 08/15/19 | Cyanide, free [amen. to chlorination] - Daily Max ug/L | 001 | 8.8 | 125.192 | ug/L |
| 08/15/19 | Cyanide, free [amen. to chlorination] - pounds per day | 001 | 9.9 | 116.3 | lb/day |
| 08/16/19 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.52 | 0.53 | mg/L |
| 08/16/19 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 554 | lb/day |
| 08/16/19 | Cyanide, free [amen. to chlorination] - Daily Max ug/L | 001 | 8.8 | 11.868 | ug/L |
| 08/16/19 | Cyanide, free [amen. to chlorination] - pounds per day | 001 | 9.9 | 12.4 | lb/day |
| 08/21/19 | Nitrogen, ammonia total [as N] - 7 Day Max mg/L | 001 | 0.37 | 0.49 | mg/L |
| 08/21/19 | Nitrogen, ammonia total [as N] - 7 Day Max pounds per day | 001 | 385 | 488 | lb/day |
| 08/31/19 | Nitrogen, ammonia total [as N] - 7 Day Max mg/L | 001 | 0.37 | 0.48 | mg/L |
| 08/31/19 | Nitrogen, ammonia total [as N] - 7 Day Max pounds per day | 001 | 385 | 401 | lb/day |
| 08/31/19 | Cyanide, free [amen. to chlorination] - monthly average ug/L | 001 | 4.4 | 27.584 | ug/L |
| 08/31/19 | Cyanide, free [amen. to chlorination] - monthly average lb/day | 001 | 5 | 29 | lb/day |

58

| 08/12/19 | Cyanide, total [as CN] - pounds per day | 011 | 21 | 136 | lb/day |
| 08/13/19 | Cyanide, total [as CN] - pounds per day | 011 | 21 | 188 | lb/day |
| 08/14/19 | Cyanide, total [as CN] - pounds per day | 011 | 21 | 138 | lb/day |
| 08/15/19 | Cyanide, total [as CN] - pounds per day | 011 | 21 | 110 | lb/day |
| 08/16/19 | Cyanide, total [as CN] - pounds per day | 011 | 21 | 35 | lb/day |

**Table 3**: Summary of Additional Effluent Violations (excluding May 2015 and August 2019 Effluent Violations in Tables 1 and 2) from April 1, 2015, to Present for All Outfalls:

| Date | Violation | Outfall | Permit Limit | DMR Value | Units |
|------|-----------|---------|--------------|-----------|-------|
| 2nd Quarter 2015 | Toxicity [chronic], Ceriodaphnia dubia | 001 | 1 | 2.04 | Toxicity Units |
| 2nd Quarter 2015 | Noel Statre 7Day Chronic Ceriodaphnia | 001 | 100 | 48.96 | Percent |
| 3rd Quarter 2015 | Toxicity [acute], Ceriodaphnia dubia | 001 | 1 | 1.18 | Toxicity Units |
| 3rd Quarter 2015 | LC50 Static Renewal 48Hr Acute Ceriodaphnia dubia | 001 | 100 | 84.78 | Percent |
| 02/24/16 | Nitrogen, ammonia total [as N] - 7 Day Max pounds per day | 001 | 910 | 952 | lb/day |
| 02/28/16 | Nitrogen, ammonia total [as N] - 7 Day Max pounds per day | 001 | 910 | 977 | lb/day |
| 02/28/16 | Nitrogen, ammonia total [as N] - 7 Day Max pounds per day | 001 | 645 | 750 | lb/day |
| 02/28/16 | Nitrogen, ammonia total [as N] - 7 Day Max mg/L | 001 | 0.72 | 0.76 | mg/L |
| 1st Quarter 2016 | Toxicity [chronic], Ceriodaphnia dubia | 001 | 1 | 1.03 | Toxicity Units |
| 1st Quarter 2016 | Noel Statre 7Day Chronic Ceriodaphnia | 001 | 100 | 96.95 | Percent |
| 08/16/16 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 577 | lb/day |
| 08/29/16 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 604 | lb/day |

| | | | | | |
|---|---|---|---|---|---|
| 08/29/16 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.52 | 0.55 | mg/L |
| 08/29/16 | Nitrogen, ammonia total [as N] - 7 Day Max pounds per day | 001 | 385 | 400 | lb/day |
| 08/31/16 | Nitrogen, ammonia total [as N] - 7 Day Max mg/L | 001 | 0.37 | 0.38 | mg/L |
| 07/21/17 | Temperature - Daily Max | 001 | 86 | 88 | F |
| 07/28/17 | Temperature - Daily Max | 001 | 86 | 88 | F |
| 07/31/17 | Temperature - Daily Max | 001 | 86 | 87 | F |
| 08/01/17 | Temperature - Daily Max | 001 | 86 | 87 | F |
| 08/06/17 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.52 | 0.92 | mg/L |
| 08/06/17 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 899 | lb/day |
| 08/12/17 | Nitrogen, ammonia total [as N] - 7 Day Max mg/L | 001 | 0.37 | 0.38 | mg/L |
| 08/12/17 | Nitrogen, ammonia total [as N] - 7 Day Max pounds per day | 001 | 385 | 450 | lb/day |
| 09/12/17 | Phenolics, total recoverable | 001 | 22 | 27 | lb/day |
| 02/27/18 | Temperature - Daily Max | 001 | 60 | 61 | F |
| 02/28/18 | Temperature - Daily Max | 001 | 60 | 62 | F |
| 02/28/18 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 645 | 702 | lb/day |
| 03/18/18 | Oil and grease, hexane extr method | 011 | 5584 | 8286 | lb/day |
| 04/10/18 | 2,3,7,8-Tetrachlorodibenzofuran | 111 | 10 | 10.9 | pg/L |
| 05/28/18 | Nitrogen, ammonia total [as N] - 7 Day Max mg/L | 001 | 0.74 | 0.81 | mg/L |
| 05/28/18 | Nitrogen, ammonia total [as N] - 7 Day Max pounds per day | 001 | 680 | 828 | lb/day |
| 07/13/18 | Temperature - Daily Max | 001 | 86 | 87 | F |
| 07/13/18 | 2,3,7,8-Tetrachlorodibenzofuran | 111 | 10 | 29.4 | pg/L |
| 07/27/18 | Temperature - Daily Max | 001 | 86 | 88 | F |
| 08/02/18 | Temperature - Daily Max | 001 | 86 | 87 | F |
| 08/03/18 | Temperature - Daily Max | 001 | 86 | 88 | F |
| 08/04/18 | Temperature - Daily Max | 001 | 86 | 88 | F |
| 08/05/18 | Temperature - Daily Max | 001 | 86 | 87 | F |
| 08/09/18 | Temperature - Daily Max | 001 | 86 | 87 | F |
| 08/10/18 | Temperature - Daily Max | 001 | 86 | 88 | F |
| 08/12/18 | Temperature - Daily Max | 001 | 86 | 89 | F |
| 08/13/18 | Temperature - Daily Max | 001 | 86 | 90 | F |
| 08/14/18 | Temperature - Daily Max | 001 | 86 | 87 | F |

60

| | | | | | |
|---|---|---|---|---|---|
| 07/26/19 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.51 | 0.63 | mg/L |
| 07/26/19 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 673 | lb/day |
| 07/28/19 | Nitrogen, ammonia total [as N] - 7 Day Max mg/L | 001 | 0.36 | 0.44 | mg/L |
| 07/28/19 | Nitrogen, ammonia total [as N] - 7 Day Max pounds per day | 001 | 375 | 421 | lb/day |
| 07/31/19 | Nitrogen, ammonia total [as N] - 7 Day Max mg/L | 001 | 0.36 | 0.41 | mg/L |
| 07/31/19 | Nitrogen, ammonia total [as N] - 7 Day Max pounds per day | 001 | 375 | 415 | lb/day |
| 12/21/19 | Cyanide, total [as CN] - pounds per day | 011 | 21 | 31 | lb/day |
| 06/07/20 | Nitrogen, ammonia total [as N] - 7 Day Max mg/L | 001 | 0.62 | 0.64 | mg/L |
| 06/26/20 | Toxicity [chronic], Ceriodaphnia dubia | 001 | 1 | 11.52 | Toxicity Units |
| 06/30/20 | Nitrogen, ammonia total [as N] - 7 Day Max mg/L | 001 | 0.62 | 0.74 | mg/L |
| 07/01/20 | Toxicity [chronic], Ceriodaphnia dubia | 001 | 1 | 21.5 | Toxicity Units |
| 07/01/20 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.51 | 0.64 | mg/L |
| 07/01/20 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 561 | lb/day |
| 07/02/20 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.51 | 0.67 | mg/L |
| 07/02/20 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 604 | lb/day |
| 07/04/20 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.51 | 0.52 | mg/L |
| 07/06/20 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.51 | 0.53 | mg/L |
| 07/13/20 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.51 | 0.67 | mg/L |
| 07/13/20 | Nitrogen, ammonia total [as N] - Daily Max pounds per day | 001 | 540 | 582 | lb/day |
| 07/15/20 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.51 | 0.54 | mg/L |
| 07/16/20 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.51 | 0.58 | mg/L |
| 07/20/20 | Nitrogen, ammonia total [as N] - Daily Max mg/L | 001 | 0.51 | 0.61 | mg/L |
| 08/16/21 | 2,3,7,8-Tetrachlorodibenzofuran | 111 | 10 | 31.2 | pg/L |
| 09/09/21 | 2,3,7,8-Tetrachlorodibenzofuran | 111 | 10 | 55.9 | pg/L |

| 10/29/21 | Cyanide, total [as CN] - pounds per day | 011 | 21 | 26 | lb/day |

**APPENDIX B**

Table 1: Ammonia Exceedances

| Date | Amount Released | Permitted Amount | Amount in Excess of RQ above Permitted Amount |
|------|-----------------|------------------|-----------------------------------------------|
| August 5, 2019 | 901 lbs | 540 lbs | 361 lbs |
| August 11, 2019 | 911 lbs | 540 lbs | 371 lbs |
| August 12, 2019 | 1117 lbs | 540 lbs | 577 lbs |
| August 13, 2019 | 891 lbs | 540 lbs | 351 lbs |
| August 15, 2019 | 854 lbs | 540 lbs | 314 lbs |

Table 2: Cyanide Exceedances

| Date | Amount Released | Permitted Amount | Amount in Excess of RQ above Permitted Amount |
|------|-----------------|------------------|-----------------------------------------------|
| August 12, 2019 | 136 lbs | 21 lbs | 115 lbs |
| August 13, 2019 | 188 lbs | 21 lbs | 167 lbs |
| August 14, 2019 | 138 lbs | 21 lbs | 117 lbs |
| August 15, 2019 | 110 lbs | 21 lbs | 89 lbs |